UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Crim. No.: 3:23-cr-00799-JFA-1 |
| | ) | |
| v. | ) | **DEFENDANT'S SENTENCING** |
| | ) | **MEMORANDUM AND MOTION** |
| VINCENT GAILLIARD, | ) | **FOR DOWNWARD VARIANCE** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Defendant Vincent Gailliard, through undersigned counsel, respectfully submits this sentencing memorandum and moves for a variance below the advisory Guidelines range.

## Introduction

Mr. Gailliard pled guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343, 1349. The Presentence Investigation Report ("PSR") calculates an advisory Guidelines range of 51 to 63 months' imprisonment based on a total offense level of **24** and a criminal history category of I.

The parties agree that given the specific circumstances of this particular case, the loss amount is overstated, and therefore the correct advisory Guidelines range is 33 to 41 months' imprisonment based on a total offense level of **20** and a criminal history category of I. If the Court accepts this agreement, Mr. Gailliard will withdraw his pending objections to the PSR. Mr. Gailliard further asks this Court to vary downward from the advisory Guidelines range.

## Legal Standard

"There is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her as an individual." *Concepcion v. United States*, 597 U.S. 481, 486 (2022) (internal quotation marks omitted). "Congress has instructed sentencing courts to impose sentences that are sufficient, but not greater than necessary, to comply with (among other things) certain basic objectives, including the need for just punishment, deterrence, protection of the public, and rehabilitation." *Holguin-Hernandez v. United States*, 140 S. Ct. 762, 765–66 (2020) (cleaned up).

"[T]he questions at the core of any system of criminal justice [are]: What sentence does the defendant deserve? What sentence will deter criminal conduct in the future? What sentence will protect the public? And what sentence is most likely to help the defendant rehabilitate for transition back into society?" *Esteras v. United States*, 145 S. Ct. 2031, 2038 (2025).

A sentencing proceeding begins with a correct calculation of the applicable Sentencing Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007). However, the Guidelines are only the "starting point"; they are "advisory only." *Hughes v. United States*, 584 U.S. 675, 681, 686 (2018). A court "may not presume that the Guidelines range is reasonable"; it "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. A court must consider not only the

Guidelines but also all other statutory sentencing factors outlined in 18 U.S.C. § 3553(a).[1] *Chavez-Meza v. United States*, 138 S. Ct. 1959, 1963 (2018).

## Discussion[2]

**I.    Advisory Guidelines Range**

The parties agree that given the specific circumstances of this particular case, the loss amount is overstated, and therefore the correct advisory Guidelines range is 33 to 41 months' imprisonment based on a total offense level of **20** and a criminal history category of I. If the Court accepts this agreement, Mr. Gailliard will withdraw his pending objections to the PSR.

Importantly, the 33-to-41-month range is advisory and marks only the "starting point" for sentencing Mr. Gailliard. *Hughes*, 584 U.S. at 681. As detailed below, a downward variance is warranted.

---

[1] These factors include the nature and circumstances of the offense; the defendant's history and characteristics; the need for punishment, deterrence, and public protection; the need for provision of educational or vocational training, medical care, or other treatment to the defendant; the kinds of sentences and the sentencing range established by the Sentencing Commission and Congress; the relevant policy statements of the Sentencing Commission; the need to avoid sentencing disparities; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

[2] The following information is based upon information in the discovery materials, the PSR, and the Pretrial Services Report, as well as Mr. Gailliard's broader person. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

3

## II. The Offense

Mr. Gailliard has pleaded guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343, 1349. There is no mandatory minimum prison term for this offense. Mr. Gailliard accepted responsibility for this offense ███████████████████████████████████████████████████████████ ██████████████████████████████ On that date, postal inspection agents approached Mr. Gailliard, who sorted mail at a U.S. Postal Service facility in Columbia, South Carolina, and he agreed to speak with them about his wrongdoing.

Mr. Gailliard admitted post-*Miranda* that he had stolen mail containing checks, taken pictures of the checks, and posted images of checks for sale via Telegram, an online application. He received between $100 and $200 per check, with the most being $300 and the least being $75.

This offense occurred over the course of approximately one year; Mr. Gailliard explained to the agents he was struggling financially and needed extra money. He learned about the scheme to steal and sell checks from a Facebook post. ██████ ██████████████████████, Mr. Gailliard consented to a search of his cellphone and allowed agents to download incriminating data from the phone.

Through his ███████████████ timely guilty plea, Mr. Gailliard has consistently accepted responsibility for his crime. *See generally* USSG § 3E1.1 cmt. n.3, cmt. background (explaining a defendant "clearly demonstrates acceptance of responsibility" by entering "a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction,

4

and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable").

Respectfully, this Court should consider ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A court may "extend a proper degree of leniency in return for [a] guilty plea[]." *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023) (quoting *Corbitt v. New Jersey*, 439 U.S. 212, 223 (1978)). A court can also show greater leniency to a defendant who "show[s] greater acceptance of responsibility by acknowledging his guilt at an earlier stage." *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

A substantial downward variance is warranted because Mr. Gailliard acknowledged his guilt ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### III. Mr. Gailliard

This Court should also consider Mr. Gailliard's "whole person" in varying downward. *Concepcion*, 597 U.S. at 486. Mr. Gailliard's crime was anomalous from the rest of his life. *See id.* at 492 (recognizing sentencing is a "federal judicial tradition" that provides "a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue").

A.   **Early Life**

Born in Sumter in 1983, Mr. Gailliard has lived in South Carolina most of his life. He has also lived in Texas, Florida, Georgia, Japan, and Qatar while working in the military and later as a government contractor.

Mr. Gailliard graduated Sumter High School in May 2001. He moved out of his childhood home on his own at age nineteen. He has a consistent employment history since high school graduation, beginning with his first job at Gold Kist, Inc., a poultry processing plant in Sumter, where he worked a full-time, forty-hour week.

B.   **Military Service & Related Employment**

In 2003, Mr. Gailliard enlisted in the United States Air Force. He was a supply apprentice who worked in the flight service division—a supply division where he was responsible for shipping, distributing, inventorying, and disposing of various equipment including aircraft parts and components. He would requisition items such as engines, wings, and wheels for installation on fighter jets and bombers. These parts would be shipped to active combat areas, including Iraq and Afghanistan.

Mr. Gailliard served in the military in the aftermath of the September 11 terrorist attacks. His service was critical to the military infrastructure that was quickly being established around the globe, particularly in Central and South Asia and the Middle East. Mr. Gailliard was stationed in Okinawa, Japan, for approximately eight months while serving in the Air Force. Crystal Green was stationed in Okinawa with Mr. Gailliard, and as a Retired Senior Master Sergeant,

6

she has written a letter commending his accomplishments both inside and outside the military.

After two years of honorable service, Mr. Gailliard separated from the Air Force in 2005 through its force-shaping program (designed to reduce the overall size of the Air Force).[3]  He was honorably discharged having attained the rank of E-2 Airman.

Mr. Gailliard then went to work as an asset manager for Centurum, Inc., a defense contracting company that services the U.S. military, including the Air Force. *See* CENTURUM, CORE CAPABILITIES: OPERATIONS AND TECHNICAL SUPPORT, https://www.centurum.com/corecapabilities/operations (last visited Aug. 26, 2025). He lived in Tampa, Florida, while working on the MacDill Air Force Base.[4]

With Centurum, Mr. Gailliard was primarily in charge of supplying IT equipment to Air Force personnel.  This job required him to have a special security clearance with the federal government.  His work supported the United States Central Command (CENTCOM) and Special Operations Command (SOCOM), juggernauts in our country's unified combatant command.  *See generally Ettefaq-*

---

[3] *See generally* Bruce D. Callander, *Force Shaping*, AIR & SPACE FORCES MAGAZINE (July 1, 2004), https://www.airandspaceforces.com/article/0704recruit/ (last visited Aug. 26, 2025) ("The Air Force has been over its authorized end strength of about 360,000 airmen since the Global War on Terror began.  The expansion was acceptable as a temporary measure under the President's declaration of a national emergency, but the service now must divest itself of the additional manpower.").

[4] While living in Tampa, Mr. Gailliard saved a toddler's life.  He was in his car when he saw the toddler exit a nearby vehicle and walk towards oncoming traffic.  Mr. Gailliard sprinted to the child and grabbed her before she could walk into the lane of traffic.  He safely returned the toddler to her parents.

*Meliat-Hai-Afghan Consulting, Inc. v. United States*, 106 Fed. Cl. 429, 432 n.2 (2012) ("CENTCOM is a Unified Combatant Command, directly under the Secretary of Defense, that assists nations, primarily in the Middle East, to combat terrorism, establish secure environments, and foster regional stability." (internal quotation marks omitted)); *Crowley Tech. Mgmt., Inc. v. United States*, 123 Fed. Cl. 253, 267 (2015) (summarizing SOCOM'S "mission to provide trained, equipped, ready, and regionally aligned special operations forces[,] and through unified action, conduct sustained special operations to eliminate threats to U.S. interests and protect the American people" (internal quotation marks omitted)).

One of Mr. Gailliard's most important assignments at Centurum was a project that involved such a great amount of equipment that the staging had to occur outdoors afterhours. Mr. Gailliard was the youngest Centurum employee responsible for this project, and he remains extremely proud of its successful completion, largely due to his supervision and contribution. Another assignment required him to spend two months living in Qatar. Mr. Gailliard worked for Centurum from 2005 until 2009.

**C.     Subsequent Employment**

Over the next several years, Mr. Gailliard attended college and worked. He took classes at Central Technical College, and while he has not completed his degree, he majored in computer science. He worked for the Amazon Fulfillment Center in West Columbia. He also worked for a document processing service that had a contract

with the Internal Revenue Service. This job required him to travel to North Carolina and retrieve tax documents.

Mr. Gailliard worked for the U.S. Postal Service for approximately six years. He started in 2017 as a Postal Support Employee with a 360-day contract. He then became a permanent employee in October 2018 and worked until May 2023.

During the pendency of this case, Mr. Gailliard has worked several jobs despite the stigma of a federal indictment and now conviction. He worked at Continental Tire and then for Hood Container, both in Sumter. He currently works at the Target Distribution Center in Lugoff, South Carolina. He is a warehouse associate at the facility, responsible for handling freight and inventory. He unloads trucks and ensures inventory reaches the proper destination. He is working full-time, and his shift is 4:00 PM until 2:00 AM Tuesday through Friday. Mr. Gailliard would appreciate any opportunity to keep this job so that he can pay the restitution that will be ordered in this case, and that he knows is rightfully owed the banks.

Respectfully, this Court should consider Mr. Gailliard's patriotic military service, negligible criminal record,[5] and employment history in sentencing him. *See, e.g.*, *Kimbrough v. United States*, 552 U.S. 85, 110–12 (2007) (approving the district court's "substantial deviation from the Guidelines range" where the court "noted that Kimbrough had no prior felony convictions," had "received an honorable discharge from the Marine Corps," and "had a steady history of employment").

---

[5] Mr. Gailliard is in a Criminal History Category I with zero criminal history points. His only convictions are for a 2002 shoplifting and a 2008 driving with a suspended license, for both of which he paid a fine.

9

**D.  Family**

Mr. Gailliard has an excellent relationship with his parents and regularly communicates with them regarding their health, wellbeing, and ongoing activities. He also has three siblings: two sisters and a brother. His sister Stephanie Brunson and brother Cedrick Gailliard have both written character letters for him.

Mr. Gailliard is engaged to his fiancée Shayla McCoy, and they have been in a relationship for the past twelve years. Ms. McCoy met Mr. Gailliard when her son from a prior relationship, ▇▇▇▇▇▇, was just two years old; Mr. Gaillard has raised and supported ▇▇▇▇▇▇ as his own son ever since. Mr. Gailliard and Ms. McCoy are also parents to their biological child, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ is 14, and ▇▇ is about to turn 10. They both love their father, who in turn adores, supports, and cares for them. ▇▇▇▇▇▇▇▇▇▇▇ are fearful of losing their father who dotes on and encourages them daily with fatherly advice and love. Mr. Gailliard lives with his fiancée and sons at their residence in Sumter.

**E.  Health**

Mr. Gailliard is currently experiencing two major health issues. First, he is experiencing involuntary weight loss now approaching thirty pounds. He weighed 280 pounds in October 2023, but currently weighs 253 pounds. A gastroenterologist has diagnosed him with abnormal weight loss, as explained below. Mr. Gailliard scheduled an appointment with his primary care doctor, who found a kidney cyst and referred him to a gastroenterologist, also as explained below. His primary care

10

doctor, as well as a urologist, further determined Mr. Gailliard had recently suffered a minor stroke.

Second, Mr. Gailliard underwent an esophagogastroduodenoscopy ("EGD") biopsy on August 20, 2025, at the Berkeley Endoscopy Center in Columbia, South Carolina. *See Estate of Sanders v. United States*, 736 F.3d 430, 433 (5th Cir. 2013) (explaining an EGD is "a procedure that visualizes the upper part of the gastrointestinal tract"). He had been vomiting and experiencing chronic nausea since June 2025. The gastroenterologist to whom his primary care doctor referred him performed the EGD.

The gastroenterologist biopsied an esophageal erythema, discovered a gastric ulcer in the inferior wall of Mr. Gailliard's stomach, and diagnosed him with abnormal weight loss. Mr. Gailliard also had medical workups for hyperlipidemia, vertigo, anxiety, and malignant neoplasms in his colon. His next appointment is scheduled for September 15, 2025, in Columbia. The prognosis remains uncertain at this time. Mr. Gailliard is also currently experiencing panic attacks.

## IV.   Protecting the Public & Rehabilitation

A custodial sentence is not needed to protect the public or provide rehabilitative treatment for Mr. Gailliard. His crime did not involve any violence, ███████████████████████████████████████████████████████ ███████████████████████████. Multiple factors demonstrate Mr. Gailliard will not reoffend. Since his release on bond in 2023, he has demonstrated over a

11

substantial period of time that he has conformed his conduct to societal norms and meaningfully contributed to society, which will continue with him paying restitution.

Mr. Gailliard does not possess a criminal history that suggests a lengthy custodial sentence is necessary to protect the public. He is a high school graduate and military veteran with educational and vocational skills extending across an impressive array of fields. His loving fiancée, sons, parents, and friends (many of whom have written letters) will be there to provide support for him; and they already need his reciprocal support. Mr. Gailliard is smart, self-sufficient, and industrious. He can and will maintain a stable residence and stable employment.

## V.     Punishment, Deterrence & Restitution

Mr. Gailliard readily acknowledges this Court must consider punishment and deterrence. But, even there, the sentence need not be lengthy to accomplish a punitive and deterrent effect. A below-guideline sentence still accomplishes "the penological goal of general deterrence," *United States v. Slatten*, 865 F.3d 767, 819 (D.C. Cir. 2017), as well as punishment and specific deterrence.

"Under the theory of general deterrence, the government essentially seeks to make an example of an offender through punishing him so that other potential offenders are intimidated into refraining from committing the contemplated crime." *Id.*; *see Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("[Regarding] the deterrence of crime[, t]he premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find

12

undesirable, they and others will be deterred from committing additional criminal offenses.").

"In terms of both specific and general deterrence, there is overwhelming evidence in the scientific literature that 'the *certainty* of being caught is a vastly more powerful deterrent than the severity of the punishment.'" *United States v. Browning*, 2021 WL 795725, at *5 (E.D. Mich. Mar. 2, 2021) (brackets omitted) (quoting U.S. Dep't of Justice, Nat'l Inst. Just., *Five Things about Deterrence* 1 (2016), *available at* https://www.ojp.gov/pdffiles1/nij/247350.pdf (last visited Aug. 25, 2025)).

> *Severity* refers to the length of a sentence. Studies show that for most individuals convicted of a crime, short to moderate prison sentences may be a deterrent but longer prison terms produce only a limited deterrent effect.
>
> *Certainty* refers to the likelihood of being caught and punished for the commission of a crime. Research underscores the more significant role that certainty plays in deterrence than severity — it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment. Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In addition, there is no evidence that the deterrent effect increases when the likelihood of conviction increases. Nor is there any evidence that the deterrent effect increases when the likelihood of imprisonment increases.

*Id.* (ellipsis omitted); *see Five Things about Deterrence* 1 ("Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crime. Prisons actually may have the opposite effect: Inmates learn more effective crime strategies from each

13

other, and time spent in prison may desensitize many to the threat of future imprisonment.").

Mr. Gailliard will have to pay restitution. He will be able to pay it off sooner if he is able to continue working. *See* 18 U.S.C. § 3553(a)(7) (requiring consideration of "the need to provide restitution to any victims of the offense"); *Esteras*, 145 S. Ct. at 2038 (explaining the restitution factor reflects a "discrete policy aim").

## VI. Letters

This memorandum provides just a glimpse of Mr. Gailliard's life. Those who have known Mr. Gailliard for decades provide the best insight:

- *"He has been a leader to his two sons, nieces, and friends throughout my time knowing him. He has been an example of patriotism by joining the military at a young age and even persuading myself to join the military which has shaped my career to this day. As we were raised in the same community where fathers are mostly not around, Vincent is raising his sons to have the values of goal driven, smart and respectful young men that is missing in the world now. He has taken on the complete role of being a father to the son of his fiancé[e] and worked hard to provide for his family while simultaneously being a person to lean on for friends and even coworkers."*

    – Eric Smith, longtime friend

- *"He is a leader to his community, and to the youth. He is someone that a lot of people look up to. . . . He is a father of two boys, that really love and need their father."*

    – Cedrick Gailliard, brother

- *"[H]e is a very devoted family man who shows with his actions that family is very important to him. With his fiancé[e] he is a very loving and supportive man. With his two sons he is a very strong father who is always involved in guiding them in their growth and journey to become good men. He also spends a lot of time with his parents and siblings who all look up to him and are proud of him.*

14

> *He is also a very hard worker who has excellent people and leadership skills. I've witnessed those skills when I saw him put together several events in which he planned, organized, and got the necessary people together to get everything done."*
>
> – LaQuan Plowden, longtime friend

- *"Vince, I like to call him "my brother," is truly a person with a strong sense of community and family values. He is a devoted father to his two young boys, ▓▓▓▓▓▓▓, as well as a Godfather to my son ▓▓ ▓▓▓▓▓▓▓▓▓▓. He has always put their well-being and happiness above anything else. His love and dedication to his family, friends, and community are what's truly at the core of who Vince really is. He is also a veteran, having served in the United States Air Force, which has instilled in him a sense of duty and responsibility.*

  *As a great friend and leader amongst our family and friends, Vince has consistently demonstrated his commitment to making a positive difference in the lives of all of us. His passion and will to push through anything and succeed are contagious, and he has inspired me and many others within our family. I have personally seen and witnessed his kindness, empathy, and willingness to give and put others first firsthand on a day to day basis when Vince once lived with my family."*

  – John Wilson, Sr., longtime friend

- *"Vincent has always been a man of grace, responsibility and compassion. As his sister I have witness[ed] his dedication as a United States soldier, father, son and husband to be to his current fiancée, especially when it came to his two young sons whom he fights for on a daily basis by educating them on how important it is to be smart, hardworking, respectful young men and to never give up on their dreams no matter the obstacles they face. When it comes to his two sons, he just has to enter the room and their faces light up, even if it's just showing up to a basketball game or watching a simple tv show at home, but to them that's everything any child could really ever ask for."*

  – Stephanie Brunson, sister

- *"I want to ask you to please understand how hard it will be for me and my brother if my dad is sent away. My dad is very important to me. He has helped me through hard times and always supported my dreams. He has helped with football even if he's tired or would rather do something else. He would give good advice if I need it. He doesn't just help me[,] he*

15

> *helps his family and others when they need it[,] even if he shouldn't or is asked not to."*
>
> – ▮▮▮▮▮▮, son

- *"I am writing this because I want to ask you to please understand how hard it would be for me and my brother if my dad is sent away. My dad is important to me because he has helped me in hard situations and he is a great guy and we love him."*

  – ▮▮▮▮▮▮▮▮▮▮, son

## Conclusion

*"I'm not a bad person, I just made a horrible mistake."*

– Vincent Anthony Gailliard, Jr., Defendant

Mr. Gailliard despises his actions. He takes complete responsibility for them. He apologizes for them: to the U.S. Postal Service, to the banks, to the businesses, to the individuals, to this Court.

A sentencing court cannot "presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States,* 555 U.S. 350, 352 (2009) (per curiam). "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Id.* A Guideline sentence would be unreasonable in this case.

Mr. Gailliard humbly asks this Court to substantially vary downward when sentencing him.

*[Signature Page Follows]*

Respectfully submitted,

<u>s/ Edmund Gregorie Monroe Neyle</u>
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite 105
Florence, South Carolina 29501
Telephone: (843) 662-1510
Attorney ID No.: 13832

Florence, South Carolina

August 29, 2025